Coleman v. Suffolk County May I have a moment, Your Honor, just to set up? Of course. Good morning. My name is Scott Quirenbaum. I'm of counsel to the law offices of Frederick K. Brewington, and we represent the plaintiff appellant here. Ms. Williams did not have to die. And if Judge Hurley had taken this court's admonishment in Obert v. Vargo, which is 331 Fed 3rd 29, when viewing the evidence on a summary judgment motion where the plaintiff is deceased, or where the victim is deceased, and we're dealing with the estate, that officer's testimony has to be even more scrutinized than it has to in a summary judgment matter, as it generally does, the court could have found disputed issues of material fact. Every step of the way, beginning in December 31st, 2010, and I'm going to divide this into two steps, from December 31st through June 20th, the jury and Judge Hurley should have found that time and again, every time the different members of the Suffolk County Police Department came into actual contact with Mr. Jenkins, they basically said to him, in some instances, the way they interacted with him, don't worry. You can do as you please to Ms. Williams and her sister, Ms. Jordan. What specifically supports that? Okay. There's plenty of evidence that they could have done more in terms of protection, but what is there to show that they affirmatively communicated implicitly or explicitly that he could engage in this violence? And again, we're talking implicitly here. So when officers Villas and Verwees, I don't know if I'm pronouncing Verwees correctly, appear on December 31st, 2010, in response to Ms. Williams' 911 call, they know that he has taken their car, that Jenkins has taken Ms. Williams' car without her consent, that he has not returned it, and Was Jenkins there that day? Oh, yeah, absolutely, because at page 501, the reasonable inference is, okay, when asked, and this is at Joint Appendix 501, at his deposition, he said he probably spoke with Jenkins. Verwees had very little recollection of the events of December 31st. And so the fair inference was that he, A, spoke with Jenkins about it, Jenkins denied it, and he believed him. Because otherwise, probable cause would have existed to arrest Jenkins for Where was the car at the time the officers responded? I don't know the answer to that, Judge. I don't know if it's Or it had been returned. It had been returned. I'm not sure if it had been returned at the time, though, because it would be inconsistent Let me ask you this. Yes, Judge. Because these officers are sued in their individual capacity, Which means that we have to find enough evidence as to each of them individually to go forward. If I understand it correctly, this is the only incident that Officer Verwees responds to. Correct. There is no allegation of violence by Ms. Williams on this occasion. It's that the car was taken and that the car is then returned. Why would you think that Officer Verwees has implicitly sent a signal to Mr. Jenkins That he is free to engage in life-threatening violence? It may not be enough for Verwees, and I will also Well, let's go through each officer, then, and tell us Why don't you start with the ones where you think your case is strongest? Sure. They implicitly sent the message. Tell us which officer you're dealing with and what the evidence is. Okay. So, Villas appears, interacts with Jenkins on December 31st. That's the car incident, which you said would not be enough. Right. Can I just make one statement before I continue on your way? Even if you find that there is insufficient evidence with respect to a particular officer, or even all of them, okay? Collectively, there could still be a constitutional deprivation for purposes of allowing a Monell claim to go forward. And that is supported by this Court's decision in Barrett v. Orange County Human Rights Commission. I agree with you on the theory that there was inadequate training and the policy was I understand that. Okay. Stay with the officers. Okay. I did want to make that point, Judge. Just to be clear, I mean, Officer Villas is there for the car incident. He's then there on March 13th, and he's there on the first incident March 13th, the call is that Jenkins is beating Williams. Correct. And they do arrest Jenkins, albeit on another warrant. Right. Unrelated to the allegation What if someone who's taken away in handcuffs has communicated to them implicitly that he's free to continue beating the woman? Because it's not for this incident. Well, what authority would you have that officers who arrest someone, even for another incident, have communicated to him that the other conduct he's free to continue to engage in? You know, the cases where we've recognized implicit condemnation are ones where the officers pretty much, by not interfering, not taking any action, allowed the harmful conduct to keep going on. Going on. Here they interrupted it because they thought the other arrest was on stronger grounds. After all, on the beating, by the time they arrived, the two participants are telling different stories. So they get him out of there, but they get him out of there on something they've got a warrant for. That's correct, that they get him out of there on a warrant. How does this scenario fit within any precedent that that kind of action by the officer is implicit condemnation? Can I just take issue with one statement that you made, Judge? Anything that you think responds to what I said, by all means. You said that because they thought there was stronger evidence on this because of the warrants. They had a warrant. They had a warrant, right. That doesn't mean that they shouldn't also be arresting him and charging him for this incident because they, she asked, Jordan testifies, her daughter, I'm sorry, her sister testifies that she heard her sister ask Morg and Vias why they weren't arresting him for being violent towards her. Okay? Yes, we accept all the facts most favorably. Correct. Of course. All right. So, it's another piece of the puzzle. Then you have, I don't have a case, there's very few state created danger cases from this circuit. And I don't have a case that says, to respond to your point about why the arrest on a bench warrant or an arrest warrant, I don't remember which one it was, doesn't send a sufficient message. But what I do know is that we have Vias twice not dealing with his, meaning Jenkins, I'm sorry, conduct towards Williams. So then we get, I'm sorry, if you have another question about this, otherwise I'll move on to the first. There's another incident with Vias and that's June. June 20th, which. I'm sorry, and you said his conduct towards Williams. Did you mean Jenkins? No, Jenkins' conduct towards Williams. Okay. In other words, Vias is not arresting Jenkins for anything he's done vis-a-vis Williams. Okay. Then we get to June 20th, which Judge Hurley's treatment of June 20th is puzzling. It's just wrong. It doesn't view the evidence in light at all. So what we have, and I want to get some direct quotes. Vias, and for June 20th it's Vias, Morg, and Mercurio for the first incident. And then it's Mercurio and McCauley for the second. So I think it's very important that Mercurio is there both times. Right, but we're starting with Vias. Vias, okay. So Vias comes along as well as with Morg, and there's one other whose name is . . . Vias, Morg, and Mercurio. And they see him having tossed all the kids' stuff out onto the street, engaging in . . . What they see is destructive behavior toward the furniture. Oh, absolutely. Yes. Oh, absolutely. Go ahead. But don't forget the call, though. I don't think you can ignore the 911 call. So he's violent towards her. He's drinking . . . well, not towards her. It says violent. Drinking kicked the door down. That's violent. And I don't think the case law . . . Judge Hurley drew a distinction about the facts of Okun. I don't think that's a legitimate distinction being physical violence, which of course is a critically important point, and violence that doesn't culminate into physical harm to the individual. All right? So . . . The officers direct him to do something to . . . They direct him to clean it up. But they . . . They direct him to return the things, and he does. The broken . . . how is that not a slap in the . . . really, Judge. I mean, how is that not a slap in the . . . I'm sorry. I don't mean to be . . . The point is that they weren't saying you can do whatever you want. No, but they weren't arresting him for clearly criminal conduct. Right, but you don't . . . you cannot argue that a failure to arrest when there's probable cause equates to condemnation, because that's not the law. The law does not require officers to arrest every time they have probable cause. The question is whether the failure to arrest in the circumstances would say to him, go ahead, continue to do this. And the suggestion we're making to you is that where the violent conduct, as the officers see it, is directed toward furniture, and they stand there until he puts whatever furniture he can back in place and brings whatever furniture is destroyed beyond retrieval into a dumpster, that hardly suggests that they're saying to him, be our guest. So tell us what we're missing here. Okay. So it ignores . . . this is an interesting case in the sense because it seems . . . The law is a small body of law. And what you're missing is what Jordan says to the officers, right? Go ahead. Tell us whatever you think is probative. No, no. So what does he say to . . . I'm sorry. Jenkins says to the officers, I'm helping her pack. I'm helping her go. How is that not a crime? I mean, it's him saying it's not . . . Judge Hurley said, well, it's his property, too. It's not. A reasonable jury could find that it was not his property, and that is, to me, a difference. Also, I'm just trying to find what Jordan said to her. He's throwing stuff out. It's not his apartment. Why don't you arrest him? Get him out of here. He's doing all this stuff to us. He's torturing us. That's at 420.21 of the record. I take . . . I agree with you, Judge Raji, that an officer who has probable cause does not have to arrest somebody. That's a well-established principle. But I think what you're suggesting at, or what we believe is the case is, when it's repeated, when every time . . . That's why we've just done the three incidents with V.S. Correct. Because it's only the last with V.S. Well, why isn't it . . . It's the first as well. First is the car. Right. Where no violence is at issue. But why does it have to be violence, Judge? That's a . . . I'm sorry. That result is that they're condoning her being abused in a way that results in her death. Your time is up, and I want to ask you about two incidents that are more serious, Mercurio and McCauley, when they return on 620 at 740 p.m. Correct. The allegation is that one of the officers, and I don't think it's identified which, tells Jenkins that it's her problem to get Jenkins out . . . It tells Williams it's her problem to get Jenkins out and not to call anymore. First of all, are you able to identify which officer says that, or what's your view on why they're both responsible for that? Are they present? Yeah, they're both there. It's Mercurio and . . . Where is Jenkins when that's being said? I don't know the answer to that. I thought he may be . . . Well, if he's . . . He may be outside, Judge. If he's not present when this is said, troubling as it may be, how does it send the signal, the implicit signal to him that he's free to do as he wishes? Well, if he's not present, then it cannot, Judge, just as a matter of . . . So, you would say that those . . . . . . cannot be viewed as conduct that sent Jenkins the message that he was free to do as he wanted? No. What . . . If he was not there, and I'll double . . . You don't have . . . But I can tell you . . . I'm sorry. I didn't mean to interrupt. I'm just wanting . . . No. Am I right that there is no evidence that he's there for that statement, that he hears anything like that, don't call us anymore? I'll . . . While Mr. Mitchell is up, I'll try and find others. But what . . . But what is . . . Can I address . . . I know my time's up, but . . . Very quickly. Very quickly. But what they do is, they know, and this is Mercurio's for both incidents, right? She calls in a panic, threatening . . . that he's threatening to burn the house down with she and the child in it. There's a history of violence. She claims there's weapons in the house, right? And they speak with Jenkins. That's in the record. Who basically . . . What are you talking . . . Denies everything. So, the message that . . . And then they say, and nothing happens to him. Now, we're talking ten minutes, most, between Mercurio seeing the violence, property destruction, and then being told, or knowing, that he's threatening to burn down the house. And nothing happens. That does send a message. Thank you, Judge. May it please the court. I'm Brian Mitchell. I'm an assistant county attorney in Suffolk County. I represent the defendants in this case. And it's the county's position, obviously, that we believe this court should affirm Judge Hurley's granting of our Rule 56 motion and dismissing the case, finding that there was insufficient evidence in the record to support a theory that the plaintiff's substantive due process violations . . . Substantive due process was violated based upon the several different events that occurred in relation to Ms. Williams. I focused with counsel on the individual officers, but let me ask you a question about the county. Whatever conclusion we would come to with respect to the individual officers, why can't a Monell claim be pursued against the county on the theory that the totality of officer conduct here, suggests that there is inadequate training about how to deal with domestic disputes, and that that is . . . rose to the level of a civil rights violation here? Why would we not conclude that, whatever we do with individual officers? Well, obviously, Your Honor, if you found that there was no violation on the part of any of the officers, then that's step one, is there has to be an underlying violation. So, I believe, if you're honest . . . Well, the problem is that the officers have to be treated as individuals. And, as you saw me go through with counsel, you know, Officer Verwiss is only there for the first incident. But, altogether, you have officers responding to, you know, more than a half dozen incidents, various ones of them involving violence. No one officer might have, you know, been so non-responsive as to amount to condemnation. But, does the fact that all these Suffolk County officers failed to respond, support a view that the county has not adequately trained so that it amounts to condemnation? If I could just amplify that one. In addition, the failure to file domestic incident reports and to readily, perhaps, void out reports, would be part of the collection of facts in suggesting that the failure to train a Type 1L claim might be maintained, the same kind of picture that Judge Raggi was drawing with some more details. And, I'm not suggesting this is how we would conclude, but I need to know what your view is because it seems that this might have to be viewed separately, even if we were to rule favorably for any officers. So, what's your position on Monell? Judge, my position on Monell, as I just mentioned, is if there is no underlying violation, I appreciate Your Honor looking at a totality concept. That, regardless of whether it's looked individually or a totality concept, there has to be a finding that the plaintiff, that Ms. Williams' constitutional rights were violated in the first place. In this instance, the right would be what she's claiming is a substantive due process right. Without an underlying violation, you can't get to Monell. I mean, there has to be an individual who has that right. By somebody, whether they're identified in the caption as a named police officer or by somebody who is John Doe or not identified. In the event that the court were to find some violation, which, of course, I would argue you should not, then the question would be, is there sufficient Monell evidence, is there sufficient evidence of failure to train? We believe that in the record, when it looks at each individual event, and when you view the reasons why officers, in many instances, filled out domestic violence reports or the instances when they chose not to, that when you look at the rules and procedures of the county, when they're supposed to do that, when they're not supposed to do that, that ultimately there isn't sufficient evidence to support a Monell theory under even a failure to train. Because the officers consistently throughout this case, when looking at all the facts in relation to why they did or did not fill out reports or why they did or did not take conduct, they're absolutely consistent with what the rules and procedures say. So my view— Should we be—I'm sorry, go ahead. How is that true on the second response of June 20th? They've just been there. They come back. I mean, you know, the first conduct is the throwing out of furniture. And as we've reviewed with counsel, the officers stand there and make him put it back, which might be construed to send a message of we're not going to tolerate this. But then 10 minutes later he's doing the same thing, and they come back and they don't do anything and they tell her don't call us anymore. And, Your Honor, you're talking about in relation to a Monell concept of a failure to train. Well, you know, we'll start with you think the officers can't be liable, so you can tell us why you think the officers can't be liable in those circumstances and why it doesn't support Monell. Certainly, Judge. As far as the liability of the officers and the underlying—what really is the crux of this case is that— and, Your Honor, used the phrase communication— that there has to be, and in this instance it's implicit, it's not explicit, an implicit affirmative communication in this to the person who is the bad— what I'll call the bad guy, Mr. Jenkins. And nowhere throughout this case is there any evidence that there is any communication to Mr. Jenkins at all. And so, for example, in the instance of July—of June— We're throughout the whole case. If you look at each of these events, there's no evidence that it was communicated in any fashion implicitly to Mr. Jenkins that he could act with impunity, that he could continue with violence, that the officers ever said to him they won't arrest him, punish him, or, most importantly, interfere with him. Because at every different—as you go through each one, you will see that the officers, they either do arrest him, as they did on that March 13th, or they tell him things that are inconsistent with the suggestion that he can continue. As far as the June 20th secondary event with Officer Mercurio, he doesn't ignore the conduct. While he doesn't arrest him, he advises Mr. Jenkins he has to stay away from Ms. Williams. He speaks to him. He makes a determination subjectively that he doesn't believe he's a danger. But in any event, he tells him that he has to stay away from her. He doesn't say, go ahead and do what you want. He doesn't say to him, you can stay here and continue to bother her. He literally tells her, you have to stay away from her. He communicates, then goes and speaks to Ms. Jordan and Ms. Williams and indicates to them, I've told him he has to stay away from you, and says to them, you stay away from him. So when we look at the underlying violation of whether there's an implicit communication to Mr. Jenkins that he can continue with impunity, there's no evidence that ever occurs. I suppose you might argue that the department as a whole communicated by tolerating this sequence of events, a willingness not to move to the next level and restrain him. Judge, the officers, and this comes up in the concept of shocking the conscience, and the officers in this instance, throughout this case, do face that concept of competing obligations. When they respond to these various calls, they respond, and when they get to the call, I understand counsel's argument about 911 calls and what are made and whether they're egregious. First thing is the record's clear that the officers don't hear the 911 calls, that it becomes a dispatch. Sometimes the dispatch will have information for them that may be consistent with the 911 call, but they don't hear the actual call. However, when they arrive at the scene of these events, then they make inquiry about what actually occurred. And if they don't believe there's probable cause, they're faced with a situation where what can they do? And for example, with that original December event, counsel neglects to mention that Ms. Williams advised Officer Verwise she did not want to have Mr. Jenkins arrested. There are other times when the officers arrive where although something is occurring, they do not believe there's probable cause to move forward. They have the competing obligation of saying, okay, we have a guy. And in most of these incidents, by the way, Your Honor, these are mostly rent and custody, mostly custody disputes and not disputes of physical violence. But when they do arrive and they make their inquiry, they are now faced with a situation of, for example, Mr. Jenkins has the baby. It's an infant child, by the way. And they say, well, she wants the baby back. But clearly under the law, we can't just arrest someone because he is the father and takes the baby. There's times later in the case where there's an order of protection issued. Plaintiffs make great deal out of that Mr. Williams had done things that they claim violated that order. However, the order had not been served. And under New York State law, it's not a violation of an order of protection to engage in conduct that the order might say is violative if you haven't been served. So the officers face those competing competitions. So I appreciate Your Honor's concept of totality of the circumstances that we sent the message. The message must be communicated. There must be evidence that Mr. Jenkins subjectively was aware of what occurred. And as we go through these, and I appreciate we look at June 20th. These things go on to July 8th, which is the last contact that law enforcement has. The last seven contacts with Mr. Jenkins, excuse me, with Ms. Williams, all involve custody situations. Of those seven, only two are Mr. Jenkins even present. So there's no evidence that Jenkins is even aware that the police are with her and what the police may or may not do. The two times that they do encounter Mr. Jenkins, one is when Officer O'Callaghan advises him that there's an order of protection. Callaghan realizes it hasn't been served, and so he reads it to him and says to him, if you violate this, you will be arrested. It is the exact opposite of what the case Okun v. Cornwall talks about. That case talks about sending a message that you won't be arrested, sending a message that we won't do it. He's told you will be arrested. Later, he's confronted at P.C. Richards, as I call out the event. The officer there reads him the order of protection again, advises him you will be arrested. There's no violation there because Ms. Williams goes to him. I mean, that's literally why there's no violation. And then lastly, on July 8th, the Sheriff's Department actually physically serves him with the order, and once again tells him, if you engage in conduct violative of this, you will be arrested. So the communication throughout this that there's any evidence of is communication that he will be, not that he'll be ignored, but the opposite, that he either has to put the stuff back in the house, that he'll be arrested, that he's not supposed to be near her. All of these different things are absolutely distinguishable from the things that happen in the Oken case, which I think is really the one that underlies whether there was liability here. And this case is extremely distinguishable from Oken. The person in Oken, the assailant, this fellow, Roy Sears, threatened the victim, did so in front of the police, bragged to the police that he could get away with this. The police had a relationship with him, which is very important. You must look at the particular relationship between the police and the assailant. And this guy, Sears, had a bar where the police drank. They drank together. He bragged about being able to abuse the victim. And the police essentially acquiesced to that. When they were at the scene, they joked with Sears. They talked about football. They demeaned or they mocked the victim. So it was an egregious case. This is nothing like that. Thank you. Thank you. Counsel, do you have a few minutes? I won't say very briefly, but I'm sure you'll make it very brief. You were going to tell us, though, where Jenkins was present. I have not been able to locate that in this short amount of time, 12 minutes. I will go back and I will write a 28-J letter if I can find it, unless the court wants a letter either way. Just make sure you have whatever you have to us by Monday, okay? Absolutely, Judge. Thank you. I'm just going to touch upon a couple of points. June 20th, the second instance with Mercurio. He tells Williams, quote, we can't keep coming here. Don't call us again, end quote. When the mother asked, what is her daughter supposed to do? One of them responded that, and Ms. Coleman, the mother, doesn't remember which one. She should go upstairs to her sister's apartment, don't say anything to Jenkins, as he's not supposed to say anything to you. Okay, that is not, or Mr. Mitchell's, the county's rendition of what happens on June 20th is not viewing the evidence in the light most favorable. They do say, we told him not to talk to you, right, and they do give him some instructions. Yes, would you really be worried if after you've threatened to kill somebody, burn the house down, destroy the property, and you're still walking around? I don't think that's much of a message. The question, though, is not whether they could have done more. No, I- The question is whether- Correct. Okay, all right. And as far as Minnell is concerned, if you don't have to, as we've talked about, we don't need to find a particular individual liable if collectively- As far as qualified immunity, but have we said it in cases where the officer is not found, no officer is found to have violated constitutional rights as an individual, but yet the totality of circumstances have supported a claim against the municipality? I believe the court said it in Barrett, which is 194- In Barrett? It's not a police officer case, but- No, no. It's 194, Fed 3, 341, 1999. I believe that's an accurate reading of the case, and I apologize if it's not. Not at all. But thank you very much, counsel, for both sides. We appreciate your arguments. We're going to take the case under advisement.